The next argument will be in United States v. Goklu, case number 24-767. Mr. Brissenden. Good morning. Matthew Brissenden for Mustafa Goklu. We've argued in our brief that this court should vacate Mr. Goklu's conviction for at least three reasons. Number one being the error in seating juror number 30, number two being the insufficiency of the evidence with respect to count two, and number three being the supplemental charge which the district court gave after defense counsel concluded his summation. And with the court's permission, I'd like to pick up with that third point if I could. Mr. Goklu was charged with operating an unlicensed money transmitting service. But under the applicable statute and the regulations, it's crystal clear that there are two aspects to that definition. It includes both the acceptance of funds and the outgoing transmittal of funds to a third party or remote location. And sitting in a car with an undercover agent, accepting Bitcoin and handing cash to that individual clearly doesn't fit within the definition of a money transmitting service. And so counsel was completely within his rights to advance this argument in summation, to argue that the government failed to demonstrate money transmission. And the lower court erred when it stepped in and decided to provide a supplemental instruction. And it erred for two reasons. Number one, it denied Mr. Goklu the right to have advanced notice of the instruction that was going to be provided to the jury. But number two, and I think more importantly, is that the instruction was fundamentally mistaken and it provided the jury which was what was essentially an infirm path to conviction. That is the notion that they could convict based on this concept that accepting Bitcoin and handing somebody cash constitutes a money transmission service. What if it was a foreign currency exchange? So instead of Bitcoin, they were doing euros and dollars? Right. So if you take a step back, the statute refers to money transmitting business, which then has multiple subsets underneath it. One of those is currency exchange. But the definition of currency exchange relates only to foreign fiat currency, actual currency of a sovereign nation. So while currency exchange could be covered, if that's what he had been engaged in, that that is not what he was engaged in, what we had here instead was virtual currency. And FinCEN has been very clear that virtual currency is not covered. So that part, your argument, I guess, is there's two parts to it. One is that that does not encompass virtual currency, and two, that that does not require the outgoing transmittal, which just the transmittal piece does. Is that right? Yeah. I mean, what I say is this definitely doesn't fall under currency exchange. And I'm confident of that. OK. Let me ask it this way, then. If it were just foreign currency exchange, would that still require an outgoing transmittal, as you're arguing? It's not necessarily an issue that I've researched in depth, because I think this is very clearly not foreign currency. But so I'm reluctant to answer the question, Your Honor. I guess the position, my firm position, is that this certainly is not foreign currency. And without having researched exactly when foreign currency, a foreign currency exchange constitutes money transmittal, I'm reluctant to answer that question with certainty. But what I am very confident about, and FinCEN has been clear about this, is that virtual currency doesn't fall under the currency exchange prong of this. Let me ask just one more piece about the movement of currency. So you're saying it has to go out. But why isn't movement on the blockchain sufficient to satisfy that in sort of a virtual way, in the same way that money going out could be satisfied in a more physical way? I think if it had been an outgoing transmission via the blockchain, that could constitute transmission. What I don't believe is that the acceptance of Bitcoin through the blockchain constitutes a transmission. It's essentially a receipt, Your Honor. Is there not still a physical, not physical, virtual movement on the blockchain of the currency from one? Presumably into Mr. Gokul's account, not outgoing, Your Honor. And if you look at the 2013 FinCEN guidance on this, and it was very clear, they outlined two circumstances under which a virtual, what they described as a virtual currency exchange, can satisfy the statute. And that is if you are a seller of Bitcoin, that means you're making an outgoing transmission, or if you accept Bitcoin from another party and then transmit it to a third party. Those are the two circumstances that FinCEN identified as satisfying the statute, neither of which are present vis-a-vis this undercover agent. And so... So accepting but not buying. I mean, I don't know. Are there any other situations where it only works one way for the purpose of the statute? Well, I mean, I think it accords with common sense, Your Honor. I mean, the business here, and this is not to say, of course, the government has other tools in its toolbox. To me, common sense is in an exchange that's going two ways and they should be treated the same. But the name of the statute isn't money transmitting exchange. It's money transmission, right? Most people, I think the common sense idea of a money transmitting business is somebody that is sending money, right? I mean, the closest synonym I can think to transmission is to send, right? And sending suggests a remote recipient. If I were to... Is there any authority, though, that the concept transmission requires transmission to a third party that you can point to, either in the regs or the statute? So the FinCEN guidance, Your Honor, suggested that there were two scenarios, and it may include the scenario that doesn't include just to a third party, right? It also included the idea is that if you are, if you have been selling the currency, that could be an outgoing transmission, or if you accept Bitcoin and then send it to a third party. So I think FinCEN has envisioned two circumstances, neither of which are present in Mr. Gokul's interaction with the undercover agent. So my view here, Your Honor, is that this supplemental instruction essentially provided the jury with an infirm path to conviction. And we know that under those circumstances, a conviction can only be affirmed if the government can demonstrate beyond a reasonable doubt that the jury didn't accept that invitation, that it didn't rely on that infirm theory. And that's not a burden the government can meet here, because they repeatedly argued to the jury in their summation, and again in the rebuttal, that the payment of cash constituted a money transmission service. At A624 of the appendix, this is in the initial summation, the prosecutor told the jury that he was operating a money transferring business because, quote, he transferred Bitcoin through a cell phone application and transferred cash by hand in exchange for a fee. And then again, in the rebuttal summation, after the court had provided its corrective instruction, the prosecutor argued he exchanged money multiple times. Defense counsel talked to you about the and this is important to the extent that defense counsel suggested that what the defendant was doing wasn't transfer. Judge Chen will instruct you that exchanging Bitcoin for cash is a transaction. And so the government expressly relied on the supplemental instruction, expressly urged the jury to convict under this theory, and they cannot demonstrate at this point, given the overwhelming evidence that they provided and the overwhelming focus on that transaction and those transactions in the car, they can't demonstrate the jury didn't rely on that theory. If the court doesn't have any additional questions on the instructional issue, I did want to talk briefly about the issue with juror number 30. Go ahead, briefly. We had a juror here who repeatedly told the court that he didn't know if he could be impartial due to his affinity for law enforcement, his concerns about white collar crime. He said he really didn't know, he wasn't sure he might be affected. And it's true the district court sought to rehabilitate him, but the responses that he gave were tepid and lacking in confidence. He told the court, I guess I will try my best. He said he's tepid and lacking confidence. That's the kind of credibility assessment that we usually defer to the district court. I agree, Your Honor. It's obviously, you're correct, the court has tremendous discretion. But the other thing that this court has also said in this area is that district courts should really err on the side of caution. It takes very little, costs very little to excuse a single juror for responses like this. But the potential cost to the defendant of seating a prejudiced juror is tremendous. The government is, I think, relying on, there's a 1972 case from this circuit called the United States v. Plouffe. And this juror, in this case, he concluded by saying, like I said, I'll try my best. And the government suggests that Plouffe stands for the proposition that a juror's assurance that he will try his best is enough to establish their impartiality. And I would submit that that's an over-reading of Plouffe and an over-simplification of the issue. The statement, I'll try my best, standing on its own, frankly conveys nothing. It doesn't convey anything about the likelihood of succeeding, right? I mean, I could tell this court I'm going to have a pickup game with LeBron James and I'm going to try my best, but the court would be mistaken to think that that's an expression of confidence. And that is the same here, Your Honor. Well, the district court, she said, he said he'd try his best and seemed sincere about that. How do we second guess that? What do we have to say that, no, she messed that up? What I'd say, Your Honor, is that 30 years after Plouffe, this court said in Nelson, a jury who could probably be fair and impartial should not be considered impartial because probably is not good enough. This juror never even said probably, said possibly, Your Honor. And so, again, I respect the district court's discretion, but I do think in this case that discretion was abused. I'm happy to answer any other questions the court might have. You've reserved a couple of minutes for rebuttal. Thank you. Good morning, Your Honors. May it please the court. My name is Francisco Navarro and I'm an assistant United States attorney in the Eastern District of New York. I represented the government in the district court. To lead off where appellant's counsel led off with the supplemental charge, he noted that this provided a notice issue to the defendant. I would note that the charge that was given by the judge, the jury charge was presented to the parties, both sides looked at it, there was a charge conference, and no issue was raised with the definition of transfer. But I'm trying to figure out what it is that defense counsel said that triggered the need for correction. Because the sort of classic thing a defense lawyer does, it says to the jury, you're going to hear from the judge the law. I submit to you that under the instruction you're given, my client is not guilty. I'm having trouble seeing why in this case, this is at 646, why what defense counsel said was problematic and required any kind of correction before we get into the supplement. I believe what Judge Chen's concern was that he was suggesting to the jury that a transfer required a transfer to a third party. And how do we get that from his actual statement on 646? That's where I'm having trouble. He just says, I'm going to encourage you to listen carefully to the judge. A money-transmitting business is a business for which a fee accepts currency for transfer. And I submit to you under that definition, Mr. Gokul is not operating a money-transmitting business. I don't know how the district court construed that as making this very specific argument about a third-party transfer. I think it was context-specific, Your Honor, because the thrust of the defense throughout the trial had been, or one of the main defenses, I should say, not the only one, was that there was no transfer to a third party, no transfer location. And he was, again, emphasizing that for the jury. And Judge Chen felt that that was contrary to her instruction, that this kind of transaction could be a transfer. And so I guess I would draw an analogy, whereas if, for example, in a drug case, the court instructed the jury that cocaine is a Schedule 2 controlled substance. That's the law. That's how it's instructed. And then defense counsel is arguing, well, cocaine is a Schedule 2 controlled substance, except in this case. But it's more like if defense counsel argued, ladies and gentlemen, you're going to hear from the judge that cocaine is a Schedule 2 controlled substance. I submit to you that you cannot find beyond a reasonable doubt that my client possessed with intent to sell cocaine or a Schedule 2 controlled substance. That's really more what happened here. He doesn't say, I'm just having really a hard time figuring out why this isn't just what every defense lawyer says in summation, and how it was inappropriate in a way that triggered this response. Again, Your Honor, I think that Judge Chen thought that what he was trying to say to the jury was not as simple as that, but it was suggesting to the jury that there needed to be more than was in the instruction that she had already approved. And Your Honor, if I could, on the 1960 point, if you look at the plain language of 1960, there's nothing in there about transfer to a remote part of your location. This statute is intentionally drawn broadly. There's no dispute here that Mr. Gokul ran a business that converted Bitcoin to cash and vice versa for a profit, and that his business fit cleanly within the definition of money transmitting business. If you look at the plain language of 1960, it establishes criminal liability for anyone who knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business. If you go one layer further, and you look at 31 U.S.C. 5330, which defines a money transmitting business, it describes money transmission services to mean the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of that currency or funds to another location or person. I'm sorry, I'm reading the CFR. 5330 has no reference to location or third party. It's only when you get to the CFR that you see it. And we would argue here that there is a transfer in two different ways. First, there's the transfer when the money is exchanged from the undercover to Mr. Gokul. Mr. Gokul takes out his phone, he provides the undercover with a QR code, and then together they work jointly to transfer the money from one account to the other. And that's a movement on the blockchain, which Harmon has said is a transfer between locations. And it's also recognized as such by the FinCEN guidance. Going from one part of the blockchain to the other is a movement, no doubt about that. And if I can give you another analogy there, it's if Judge Park, for example, were to transfer $100 to Judge Matsumoto through Citibank, no physical movement of funds would occur. It would simply be the movement of items on Citibank's ledger. The blockchain is no different. Second, and Judge Chen picked up on this in her Rule 29 opinion, where she said that there is also a second transfer, and that's once the blockchain transaction has been completed, Mr. Gokul then hands cash to the undercover. And Judge Chen noted that there is nothing on the face of 1960 or any other statute or regulation that suggests that a transfer of funds from a defendant back to his customer does not qualify as a transfer for 1960 purposes. And she further noted that Mr. Gokul's proposed interpretation of the statute would create a regulatory vacuum. Section 5330 would require currency exchange businesses to be licensed, but Section 1960 would attach no penalty for their failure to do so because such businesses are not engaged in transfers. So you're looking at the statutory scheme as a whole to see that the two congressionally passed statutes do not mention the type of transfer that Mr. Gokul does. And then the cases, Fiella, StatQ, Harmon, all stand for the proposition that what Mr. Gokul was engaged in was a money transmitting business. And there's no doubt here that he was doing this with the undercover. He was doing it with plenty of other customers, and money and Bitcoin were going both ways. This is exactly the type of conduct that Congress intended to capture. With regard to the juror issue, as your honors noted, Judge Chen here had broad discretion, perhaps broader than at any other point in the trial, to evaluate forced cause challenges or prospective jurors. And this court's case law holds that there has to be a clear abuse of discretion for a ruling to be disturbed on appeal. And the cases in which appellate courts have reversed this report on jury impanelment have been cases where there was an egregious source of bias, which was not present here, where the juror could not provide any assurances of impartiality, or the district court itself was unsure about the juror. Well, here, didn't the judge continue to question this juror and elicit a response ultimately that was not, it was still equivocal, but at least it was an affirmative statement that this juror would try his best? That's right, Judge Matsumoto. So there was two issues that Judge Chen had to deal with. Number one was the juror expressed a pro police bias because he worked for the parks police. She questioned him about that, observed his demeanor, and found him credible when he said he could set aside those biases and make his own decisions about the law enforcement testimony if it's presented in a neutral manner. And then he affirmed that he would try his best to decide the case based on the evidence. So Judge Chen was satisfied with that. And also point out that Judge Chen's larger concern here was that this juror did not want to serve, and she noted that in the record. And it's telling, Your Honor, that the case was described when Judge Chen gave a statement of the case to the entire veneer. She described it as a case involving money laundering and unlicensed money transmittal, full stop. She didn't get into the facts of the case at all. And it's also notable that prior jurors before this juror came up had gotten off the jury for expressing a pro-law enforcement bias. So that's the background that Judge Chen was dealing with. He says he has this pro-police bias. When Judge Chen pushes back on that, he sua sponte, pivots, to say, Oh, but there's also a Madoff issue, and I had a friend who lost money in Madoff. There was nothing about Madoff in the record. Nothing to suggest this case was a fraud case like Madoff. And so Judge Chen observed that and nevertheless engaged on the Madoff issue and asked him if he could put aside any feelings about friends who had been affected by Madoff's scheme. And he said he would try his best. He said he would. I'm sorry. He said, I believe so, full stop. And that's at A122 to 23. And that's when Judge Chen said, as Judge Park noted, he said he would try his best and seemed sincere about that. I think he can be objective. I have a question. I'm sorry. Go ahead. No, no, please. I have a question about the sentence. I So the district court included the first three, the first three deals as part of the amount, which I'm not sure was correct, but that changes the guidelines range if you only look at the last four. And so I'm not sure if we get to harmlessness, what exactly your argument is. So does that not matter that the range changed? So the range as calculated by the court was 51 to 63 months. And the harmlessness point that I believe we were trying to make is that the sentence here was 16 months. So even if you exclude the first three, Judge Chen still went well below the range without the three. But she didn't say that she would give the same sentence regardless of that, of the base offense level, right? No, she did not. But what she did say is that she was discounting as she thought the guidelines overstated the offense conduct here and particularly on the amounts. And the reason for that was that the undercover was the driving force here on the amounts. He was the one that suggested, and I'm going to make up the number, but let's say $50,000, right? But don't we normally require that statement when we find a guidelines calculation erroneous? We require, we generally require that the record reflect that the district judge expressly asserted that they would give the same sentence regardless. And I would respectfully submit, Your Honor, that Judge Chen did make that record. She simply may not have said those quote unquote words, but that certainly was the tenor of the sentence that she was discounting. Your argument is that she made that point by saying that it's not the amount that's motivating this sentence, the 16 months going down? Correct. And she made that very clear once she had moved on to the 3553A factors, that the prime moderator for the sentence was not the guidelines and that she was discounting that. Am I wrong that our case law tends to say, though, that you need an express statement? Your Honor, like my colleague, I am hesitant to answer that question definitively because I have not looked at that. Well, that's my read of it. But what you're telling us is that we can draw the inference that she would have given the sentence? That's correct, Your Honor. Her sentence was drastically below even what the guidelines would be if you took out those three transactions. And I will note that the first three transactions were also the smallest in number, but the numbers that really drove the sentence were the latter transactions. I just want to make sure I'm understanding precise here. Is it that it was the amount that the 16 months was so far below the range that the range being one notch down wouldn't have mattered? Or is it what she said about why she was giving 16 months? I think it's both. The sentence was 16 months, and the 16 was below either the PSR range of 51 to 63 or the range without the three, which I believe is in the 40s. And so it's that. And she also made clear why she was doing that. That she was doing that because she was discounting the amount of the money exchanged and therefore basing the sentence on other factors. The court has no other questions. I see my time is up. Thank you, Your Honor. And we ask that you affirm. We'll hear a rebuttal. Just briefly, there was nothing the defense counsel said that contradicted the judge's instructions, the instructions that both the parties had reviewed and agreed upon in advance. Nothing that he said in his arguments contravened or suggested those instructions were wrong. He expressly relied on the verbatim language of those instructions to advance his arguments. So there was nothing that he did to invite the response that he received. The government argues that paying cash for Bitcoin is a money-transferring service under the statute. But if the court looks at the cases that the government has cited, too, I think there's four cases. Each and every one of those cases involves the outgoing transmission of Bitcoin. The government can't point to a single case anywhere that resembles this fact pattern, accepting Bitcoin and handing a person cash in person. Not only is it not in line with the authority that's out there, the regulations, the language of the statute, the cases, it contravenes the common meaning of the statute and its language. The very word transmission suggests a remote recipient. If I were to scribble out a note right now and hand it to your honors, nobody would say I transmitted a note. It's not what that word means in common usage. Nobody would understand the statute to cover that type of conduct. The last thing with respect to the sentence, I don't believe the court expressly stated that she would have imposed the same sentence regardless. I do think that's a requirement to find harmlessness. And the government suggests that it's meaningless. The total loss amount here was $133,000 approximately. Those first three transactions constitute $47,970. So it's a significant chunk of the amount of money that was under consideration at sentencing. It wasn't a meaningless error and it was error. It's still a significant variance from the guideline. If you were to take up those three transactions and only rely on your calculation for the last four, correct? It would absolutely alter the guidelines recommendation. But still below the guidelines. She did provide a below guideline sentence, but on a very different basis, right? And so we don't know what the judge would have done if she had come to the conclusion that actually sort of the first half of these interactions weren't even money laundering. I think there's a fair argument that could have affected her judgment as to what the appropriate sentence would be. Happy to answer any other questions. Thank you, counsel. Thank you both. Thank you for joining us. Next case for argument would be number 25808. Good morning, Your Honor. May I reserve two minutes for rebuttal? Good morning. May it please the court. This appeal turns on legal error, not factual dispute. This case is not about whether the private school was perfect or whether progress was fast enough. It is about whether parents can be denied reimbursement by being held to a higher burden on prong two than the district is on prong one. Here the DOE failed to present a faith case at all. Yet the IHO, the SRO, and eventually the district court denied reimbursement by opposing public school compliance standards on a unilateral placement, relying on evidence that existed only because the hearing violated IDEA timelines and then skipping the equities analysis entirely. Instead of asking whether the private school was reasonably calculated to confer educational benefit on the student at the time of placement or at any time, the IHO, the SRO, the district court demanded proof of success, relied on hindsight, and speculated about service delivery. These are all things this court has rejected. It seems to me, though, that the school conceded that it did not provide the services that it outlined as necessary for the child's educational program, the FAPE, and failed to meet due to staffing shortages. There's no debate about that, correct? Some of those services, your honor, yes. Some services were provided, but not to the degree that the school determined were necessary to give that child the educational benefit that, you know, intense therapy that the child needed. Yes, and here's part of the problem with how that happened. Here the I-BRAIN school developed an IEP or an education plan, which this court has held many times the private school does not need to do. So what became an ambitious program or plan for the student all of a sudden became mandates. The private school is not mandated to create an IEP, nor is it mandated to provide every service the parent wants provided for the student. But that was the promise to the parent, right? Effectively, I-BRAIN said, if you place your child with us, this is the program we'll implement. And so it seems to me that that is relevant both to the reasonableness of the placement, but also doesn't the parent have a claim against the school here? Isn't the problem that the school made a promise to the parent and the school failed to deliver, and as a result, the parent is on the hook for tuition? Which is why, if this is to be considered at all, it would be and should be a three-pronged analysis. Okay, but doesn't the parent, isn't that really where the fault lays here? Is that the school failed to deliver on the promises it made, and that's why it was that the reimbursement was denied? Yes and no. There was testimony that the school was going to make up those services. It lost staff when it hired staff. It then testified that the school was going to make up those services, and this is where the SRO speculated that there was not enough time left in the school year. Did they in fact make up the services? Do we now know that? I don't know, Your Honor. So you don't have a position on whether your client has a cause of action against the school? No, I don't, Your Honor, no. The problem is we're looking at this for the purposes of reimbursement in this school year, which would have ended in June. The school could very well have made up services into the next school year, but that wouldn't be part of this reimbursement. In other words, the school ended the end of June, the next school year starts in July, whether or not services were made up the following year. I would also note that this student was making progress, right? It's referred to as anecdotal progress, but given this student's disabilities, there was progress. So let me ask you about that. It seems like you have a mixed message on post-hoc information. So on the one hand, you don't want us to consider whether the services promised were delivered, but you do want us to consider the progress the student made even with the limited services. It should not be dispositive. First of all, nobody here said the student regressed. They said there was no proof of progress in the record. Yet there is proof. It's described as stant evidence of progress, but there's some evidence of progress. But I'm not trying to have it both ways. If you look at the school and the program at the time the parent made the unilateral placement, it was an appropriate program for the student. The fact that some services were not delivered, but by the way, if we look at the IDA timelines, the due process complaint was filed July 6th. The hearing should have been completed by September 9th. The fact that we're looking at the entire school year is because the IHO did not adhere to those IDA timelines. In fact, SRO, I believe it was Crowlack, in looking at the parent's affidavit signed in August of 2022, where she said there was some progress that was made, the SRO actually said August was too soon to determine whether progress was being made in a program like this. Is there an authority that says you evaluate placement at the time of enrollment? I thought, and I thought where you were going in response to Judge Miriam's question, was that we look at the totality of the circumstances. And so that brings everything in. And some of this is after the time of enrollment, but that's just a function of litigation takes some time and that can cut either way or both ways. And so we, as a court, have to look at all of it. There is language that says you look at the unilateral placement at the time it's made, but your honor is correct. You do look at the totality of circumstances, but here, if you look at the unilateral placement at the time it was made, this is an appropriate program for this student. Just like if the student needed and was supposed to get transportation for the school year, let's say, and did not, that becomes a reimbursement issue. The district would say they didn't receive the service, so we're not going to reimburse the parent for the transportation. Here, if there were related services, the student didn't get it. And again, there's no evidence here or discussion of regression at all. And you have held that progress is not necessary to determine whether the placement is appropriate. So the idea that this is found to be, and if I may, just to read from the IHO on page nine of the... I guess first I just want to make sure, Hardison, TK, those are cases where we did take a look at post-enrollment facts. And so I just want to make sure that we are okay to follow that, and in your view, that that is an appropriate consideration under the totality of circumstances. Or if your argument is something different, which is that time freezes at the time of enrollment and we don't look anything past that. I don't think it freezes, Judge, but in the first instance, if you're going to say the school is appropriate on day one, but then becomes not appropriate, there are times the totality of circumstances is relevant. But here... Can that happen? I mean, isn't that part of the risk of a unilateral placement? Yes, but progress is not one of those circumstances that this court has found is dispositive. In the totality of circumstances here, the student got the related services that she needed two to three days a week instead of five. Okay, that wasn't part of the I-BRAIN IEP, but the I-BRAIN school wasn't required to create an IEP. So if that goal were two to three days in the first instance, does that make this school inappropriate? Again, I think there's a way to deal with this is the equities rather than saying this student a month, two or three months before this case, the prior year, the same IHO found the same program to be appropriate at I-BRAIN. Well, in this case, didn't they look at the record very carefully, both the IHO and the state officer, and they looked for evidence that the services had been provided. And they also noted that the head of the school was... who didn't have personal knowledge of the services that were promised but not provided. Nonetheless, made the statement that the student had progressed but had not really had interaction or observation of the student and could not make that statement. It seems to me that we have to give some deference or the district court gave deference to the expertise of the hearing officers and SRO and determined whether or not they appropriately relied on the record, which was, you know, had no evidence of the type you are asserting. The director did testify that she spoke to the child's teachers and they told her that some had been made. If I may just read from the FOF here, the IHO found the IEP developed by I-BRAIN appears on its face to be both comprehensive and specifically tailored to meet this student's individual needs. The IEP was drafted collaboratively by teachers, related service providers, administrators at I-BRAIN, and that goes on. On the other hand, the district is correct. There is no evidence of progression, no evidence of PROC, scanned evidence regarding progress. The private placement totality of circumstances as part of the analysis doesn't have to be perfect and you have so held, and I believe it's Frank G. and Gagliardo, it's designed to meet the of the student. It was designed to do that. If that is what should make it appropriate, and then you can discuss whether or not certain services were provided becomes a reimbursement issue, your honor. Thank you, counsel. You're reserved a couple minutes for a vote. Mr. Sinclair. Good morning. May it please the court, Ian Sinclair with the New York City Law Department for Appellees. The district court correctly deferred to the SRO's well-reasoned decision denying plaintiff's request for private tuition reimbursement. So starting with what this court has said in the past, there's no basis for the plaintiff's claim that the adequacy of the private placement turns on what the parent reasonably believed when they opted out of the public school option. Page six of the reply, plaintiff purports to quote this decision, this court's decision in CL about making progress under the proposed plan. That quote actually comes from Gagliardo and the preceding clause makes clear that they're talking about the IEP, not about prong to analysis. Indeed, I'm not aware of any court, any decision from this court where that has held that SROs should limit the inquiry to the offer made by the private placement or even heavily weigh that evidence above competing evidence. On the contrary, again and again, this court's decisions have held that objective evidence documenting progress is preferable under the law of this circuit and that the core question is whether the private placement provides present tense educational instruction specifically designed to meet the unique needs of the child. It's an ongoing obligation and that's really the core difference here. Plaintiff is trying to implicitly compare prongs one and prong two, but they're addressing different scenarios. Prong one is the road not traveled. So all we know is what the parent projected, which is the IEP. Prong two is parallel to what the analysis done when a student actually opts into the public placement. In those contexts, the school district cannot rest on the laurels of a well-crafted IEP. It has to actually provide the services that create a free appropriate public education. That's what prong two is looking at. It's looking at for the placement that the parent selected, does it provide the services that the school district could not or would not do? And that's why it's a totality of the circumstances. Well, it seems to me that the plaintiff's counsel is arguing that we're being asked to hold the private placement to a higher standard than what would have been required in a public school placement. And arguably, this student may have received more services than she would have in a public school setting. So a couple points on that. The first is that the proposed plan that I-BRAIN put forward is roughly identical to what the IEP proposed. So we don't know that they would have gotten more services under the public school district than what they would have gotten at I-BRAIN. But the second is that the plaintiff has described this as that the district court and the SRO sort of layered these different requirements on. But that's not what either of those decisions held. When they looked at the threshold question of did they provide the services that were recommended, that was just the first step. The next step was then to say, well, based on what was provided, we know roughly half of the services were provided. Did they make progress under those services such that it might still be appropriate even if it wasn't what was initially recommended? That's an alternative outlet. So it's a lower burden. And the SRO acknowledged that it was a lower burden. It said the school district didn't have to produce the plan in the first place and it didn't have to meet all the same standards that public schools have to. And I think the plaintiff relies heavily on Frank G. in the reply. But this kind of extended analysis over time where the student's evidence of progress can be helpful, not just harmful, is exactly what happened in that case. So there the student opted for a private placement. It wasn't exactly what was recommended. There weren't specific education in the areas of need, but there was a small size classroom which was part of the recommendation. And the student's teacher, in fact, adapted their teaching to that student's needs. It seems like there is some procedural unfairness here. I mean, Ms. Kahnemove made a decision based on what was going to be provided. And because the process of appealing the denial took as long as it did, and Ibrahim ran into some staffing issues, she then got stuck with a situation that was unforeseeable at the time she made the decision. Well, we actually don't know that it was unforeseeable because we, as we note on page 29 of our brief, even if we credited plaintiff's argument here, there's nothing in the record about when the staffing shortages began. So we don't know that those staffing shortages weren't known at the time that the parent opted in. So even if that's how the test worked, they still didn't meet that component of their purpose. Well, what if they were? I guess what I'm looking for is what, you know, is this what is contemplated by the totality of the circumstances analysis and the risk borne by the parent making a unilateral placement decision? I think in a sense, yes, it is part of the risk. I think the Supreme Court and this Court have both been clear that you, opting for the private placement is done at the parent's financial risk. And as the person who is selecting the education program, they're sort of the one who's looking at everything. So the burden falls on them to say the thing that was offered me was not appropriate under the Act, but I'm opting for something that is appropriate under the Act, or that I think is appropriate under the Act. But that's the point, right, that they think is appropriate. And so what's a parent to do, right? You all make a point in your brief, which I think is well taken, that you can't say we're going to reimburse everyone based on a promise. Those promises might never be fulfilled. I understand that. The flip side of that is, what's the parent to do if the public school district's proposed plan is plainly inadequate, which there was no argument here it was adequate. So let's assume for the sake of argument that it is facially inadequate. The parent is left with the choice of gambling with their finances or gambling with their child losing an entire year of education. What's the parent to do? I think it's a tough decision. That's why the risk falls on them. And I think that the question of whether someone is entitled to reimbursement under the statute, which is ultimately predicated on the child receiving public education services, is a different question than whether it's proper for the school to charge the parent tuition. You were asking my colleague about that question on the opening. There's no evidence in the record about what the agreement was between the parent and Ibrane. But I think it's a separate question of whether it's proper to charge them than whether they met their burden under the statute. So to be clear, when I'm looking at TM talking about the Burlington Carter test and that second prong, which is where we are, is the alternative private placement appropriate, your position is that it is the actual education received, whether that was appropriate, as opposed to whether the parent's decision to place the child there was appropriate. Yes. And I think it has to be, because much like we wouldn't allow a public school district to say, well, we tried to offer something really great, and we just didn't come through, that wouldn't satisfy the terms of the IDEA. It wouldn't create, it wouldn't be a thing. Much in the same way, we can't, like, schools can't just offer something really nice and then rest on their morals. That wouldn't, again, meet the terms of the statute. And how does it affect the situation here that the parent may have been relying in part on the fact that this particular school was deemed adequate the year before? The year-to-year, each year is analyzed separately, and so we don't... But that doesn't play into appropriateness or reasonableness? I guess if they had met their burden under the prong two, and we were able to reach the equities, maybe it would have been factored in there, but it doesn't affect the question of, was within the school year that was being analyzed, did they receive services that were specially designed to the unique needs of the Those services weren't provided, at least to the extent that the SRO found evidenced, yeah, to the extent that the SRO found that those services weren't provided in a way that were actually tailored to them. I see my time is up. Oh, I have another minute. I'll just lastly, you know, point out that as your honors have been discussing, the SRO here did properly consider the entire administrative record. That's really the core question. They thoroughly examined the child's needs. They reviewed the recommended programs, both under Ibrane's plan and the school district's IEP. They considered what services Ibrane actually provided and what education benefits the child derived from those. They considered the lack of objective evidence, which was absolutely essential to this court's decision in partisan, that the SRO is best to determine when enough evidence is needed to draw a conclusion. And they weighed Ibrane's ability to make up those missed sessions, given the director of special education's very candid admission that they were significantly understaffed and had no plan to fill those gaps except for one of the seven services. If there are no further questions. Thank you, counsel. I'll ask this was found to be appropriate. The DOE in its IEP included much of the services that were in that Ibrane IEP and referenced throughout its IEP that the student was making progress at Ibrane. This wasn't a case where their IEP was found to be insufficient. They didn't put any witnesses on prong one. So the IHO said she was constrained to find they didn't provide a fate. So it's interesting that the city would say the program was inappropriate, yet built it into their IEP, which is again why I say for the purposes, I think counsel mentioned there was no evidence of the price of tuition. Usually that comes in on prong three. Nobody was talking about the cost of the on prong two. That wasn't appropriate. We get to the cost of the program on prong three and then we discuss whether or not the parent is entitled to complete reimbursement, complete denial, or some kind of reduced reimbursement. Again here, the evidence in the record, the IHO and the SRO look at the record and say there's no evidence of progress, although when this court talks about progress, we very often talk about regression. The program must be developed to allow the student to progress during the school year rather than regress. The program, this program was appropriate. The fact that staff members may quit or for whatever reason leave, does that make the program itself, the school, inappropriate or does that go to a reduction of tuition or reimbursement and as you said, perhaps a claim the parent may have against the school rather than the appropriateness of the program itself. Any other questions? Thank you. Thank you, counsel. Thank you both. We'll take the case under advisory. And finally, a lower argument in case number 25-117, Simonetti. Thank you. Ms. Simonetti, whenever you're ready. Good morning, may I please the court? Maria Simonetti, Pro Se. Can you pull the microphone closer? Thank you. The STNY mistakenly classified the civil rights claim as a child custody dispute. So I think they're not right to do that. I'm the appealant in this action to litigate my rights, parental rights, the fraud and divorce that my husband did to me. And all the cases he did in Brazil was fraud. I'm married in New York. The defendants fraud and consoled the marital and, sorry my English, erroneous assets. My in-laws die. I live in a house, six million dollars. We have two house here and in Brazil. My daughter, older daughter, born in New York. So we have, I was married for 15 years, no work because I don't to work. He don't let me work. He kept me like a horse, just doing what he wants. When she was like 13, the oldest daughter, I got pregnant again. So I was not, I was being abused all the time. Financially, he kept the money. I don't have a credit card. I don't have access to the banks, nothing. Just take care of my daughters. I got pregnant again. The baby born eight months. She born before the pregnancy with the stress. I had a lot of stress. When his father died in 2008, 2006, I want to come to New York to take care of my in-law, my father-in-law and my mother-in-law. The whole family Italian, I love them and I cry for them. I have them like my family also. I call my father-in-law, I call daddy, mom and his brother was like my brother. So he take me away from the family. He get involved with the bad people in my country. The issue that we're trying to figure out today is whether your claims belong in this court or the Southern District of New York. I tried all the courts in New York. That's the only court that accepted my case. I went to White Plain to open a case. Brooklyn, they didn't even let me talk with the judge. I'm being damaged, financial damage. After I find out he was involved with bad people, after I start learning English, I read all the papers. I was damaged since I got in a shelter in New York. Could you bring this case in the state court instead of in the federal court? I went everywhere. I went to FBI when I find out. That's still federal. I know. I'm just saying, I tried to talk with the FBI investigator that I need protection. My daughter needs protection. Everything that you're complaining about with regard to yourself and your daughter appears to have occurred in Brazil. What remedies, if any, did you seek from Brazilian courts? She's a citizen. But she has always lived in Brazil. She's never come here from Brazil. She's being tortured. No, but that's not my question. My question is, what relief have you sought? She doesn't have her rights. What relief have you, as her mother, sought from courts in Brazil? Sorry? What relief have you, as the child's mother, sought from the courts in Brazil? I misunderstand your question. Sorry. Have you gone to court to file a lawsuit or to gain custody in Brazil? My sister became a lawyer. My daughter became a lawyer to get into the case. After my sister became a lawyer, I have access to the papers. I don't have access to the file. Everything wrong. You can see that he had a travel permission, international travel permission. His name, G.A.S. How a person, a father, opened a case to travel with a little girl, G.A.S. I never was serving. The judge who gave me my daughter to him, temporarily, she died. The Supreme Court judge who helped me, he took out his permission to travel.